Execution Version

DATED 31 December, 2021

**(1)   THE PERSONS LISTED IN PART A OF SCHEDULE 1**

**(2)   SEDICII INNOVATIONS LIMITED**

_____

**AMENDED AND RESTATED SHAREHOLDERS AGREEMENT**
**in respect of Sedicii Innovations Limited**

_____



Riverside Two
Sir John Rogerson's Quay
Dublin 2
D02 KV60

7893303.11

**CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 3 |
| 2. | COMPLETION | 8 |
| 3. | BOARD DIRECTOR AND BOARD OBSERVER | 9 |
| 4. | TRANSFER AND/OR ALLOTMENT OF SHARES/ANTI-DILUTION | 10 |
| 5. | DEED OF ADHERENCE | 11 |
| 6. | TRADE SALE / TAG ALONG / DRAG ALONG | 11 |
| 7. | TRANSFERS ON CEASING TO BE AN EMPLOYEE | 12 |
| 8. | TRANSFER ON TERMINATION OF THE NUIG LICENCE AGREEMENT | 13 |
| 9. | APPROVAL OF CERTAIN MATTERS | 13 |
| 10. | INFORMATION AND CONFIDENTIALITY | 14 |
| 11. | CONDUCT OF THE BUSINESS | 15 |
| 12. | RESTRICTIONS | 15 |
| 13. | NOTICES | 17 |
| 14. | GENERAL | 17 |

SCHEDULE 1 – THE SHAREHOLDERS ..................................................................................................20

SCHEDULE 2 – COMPANY INFORMATION ...........................................................................................24

SCHEDULE 3 – SHAREHOLDER MAJORITY RESERVED MATTERS .........................................................25

SCHEDULE 4 – Z2B MINORITY RESERVED MATTERS ...........................................................................26

SCHEDULE 5 – ENTERPRISE IRELAND RESERVED MATTERS ................................................................27

SCHEDULE 6 – DEED OF ADHERENCE .................................................................................................30

SCHEDULE 7 – CONSTITUTION ...........................................................................................................31

**THIS AGREEMENT** is dated 31 December, 2021

**BETWEEN**

(1)     **THE PERSONS WHOSE NAMES AND ADDRESSES ARE SET OUT IN PART A OF SCHEDULE 1** (together **Existing Shareholders** and each an **Existing Shareholder**);

(2)     **SEDICII INNOVATIONS LIMITED**, a company incorporated under the laws of Ireland, with registered number 537185, having its registered office at ArcLabs Research Centre, WIT West Campus, Carriganore, Waterford (the **Company**).

         (hereinafter together referred to as the **Parties** and individually as a **Party**)

**BACKGROUND**

A       The Company was incorporated in Ireland on 19 December 2013 and is a private company limited by shares. Further details of the Company as at the Effective Date are set out in Schedule 2.

B       The share capital of the Company is divided into two classes of shares in the capital of the Company, ordinary shares of €0.0001 each (the **Ordinary Shares**) and preferred ordinary shares of €0.0001 (the **Preferred Ordinary Shares**) as at the Effective Date.

C       On 20 July 2017, the Original Parties entered into the Original Agreement to record their agreement in respect of their respective shareholdings in the Company and certain matters which the parties agreed regarding the Company.

D       On 3 August 2018, Enterprise Ireland subscribed for 150,000 Cumulative Convertible Redeemable Preference Shares and on 10 December 2018, Enterprise Ireland subscribed for a further 150,000 Cumulative Convertible Redeemable Preference Shares.

E       On or prior to the date of this Agreement, Enterprise Ireland converted all of its 300,000 Cumulative Convertible Redeemable Preference Shares into 122,291 Ordinary Shares and converted all sums outstanding under the EI Loan Notes into 14,461 Ordinary Shares (such shares together being hereinafter referred to as the **EI Conversion Shares**).

F       On or prior to the date of this Agreement, In-Q-Tel converted all sums outstanding under the IQT Loan Notes into 62,209 Preferred Ordinary Shares (the **IQT Conversion Shares**).

G       On or prior to the date of this Agreement, Sean Van Den Haute converted all sums outstanding under the SVD Loan Note into 55,511 Preferred Ordinary Shares (the **SVD Conversion Shares**).

H       On or prior to the date of this Agreement, Twilightford converted all sums outstanding under the TWF Loan Notes into 136,074 Ordinary Shares (the **TWF Conversion Shares**).

I       On or prior to the execution of this Agreement, the NYC Investors and the Company entered into the NYC Subscription Agreement, pursuant to which the Company agreed and to allot and issue 191,855 Ordinary Shares in aggregate to the NYC Investors for an aggregate subscription price of €863,000 (the **NYC Investor Shares**).

J       On or prior to the execution of this Agreement, the Integra Investors and the Company entered into the Integra Subscription Agreement, pursuant to which the Company agreed and to allot and issue 135,610 Ordinary Shares in aggregate to the Integra Investors for an aggregate subscription price of €610,000 (the **Integra Investor Shares**).

K       The parties have agreed to enter into this Agreement for the purposes of amending and restating the Original Agreement and to record their agreement in respect of their respective shareholdings in the Company and the future conduct of their relationship as shareholders in the Company and certain matters

which the parties have agreed regarding the Company following the Effective Date.

NOW IT IS AGREED as follows:

1. **Definitions and Interpretation**

    1.1    In this Agreement and in the Schedules unless the context otherwise requires or unless otherwise specified:

| Affiliate | means any person which in relation to the person concerned is a Holding Company or a subsidiary or a subsidiary of a common Holding Company. |
|---|---|
| Bad Leaver | has the meaning given to such term in clause 7. |
| Board | means the board of Directors of the Company from time to time. |
| Breach Termination | has the meaning given to such term in clause 8. |
| Business | means the development of software used to provide various authentication and identity verification services. |
| Business Day | means a day (other than a Saturday or a Sunday or public holiday) on which banks are open for retail business in Dublin. |
| Companies Act | means the Companies Act, 2014 and every other enactment which is to be read together with that Act. |
| Completion | means completion of the matters set out in clause. |
| Confidential Information | means any non-public information relating to the business, accounts, finances, contractual arrangements or intellectual property (whether owned or licensed by a Group member) or other dealings, transactions, affairs or property of the Company or any other Group member other than information which: (a) is published or otherwise generally available to the public; or (b) which has, after receipt by the recipient, been published or otherwise made generally available to the public, through no act or omission of the recipient. |
| Connected Person | means a person connected with the Shareholders or any of them as defined in Section 220 of the Companies Act. |
| Constitution | means the Constitution of the Company in the form set out in Schedule 7 to be adopted by the Company on or before the date hereof. |
| Converted Shareholders | |
| Cumulative Redeemable Convertible Preference Shares | means the 8% cumulative redeemable convertible preference shares of €0.0001 each in the capital of the Company. |
| Deed of Adherence | means a deed in the form or substantially in the form set out in Schedule 6 or such other form as the Shareholders may agree. |
| Director | means a director of the Company. |
| Drag-Along Notice | has the meaning given to such term in clause 6. |

| | |
|---|---|
| **Drag-Along Right** | has the meaning given to such term in clause 6. |
| **Effective Date** | means the date of this Agreement. |
| **EI Conversion Shares** | has the meaning given to such term in Recital E. |
| **EI Loan Notes** | means €50,000 nominal amount of the loan notes constituted under the loan note instrument issued on 22 June 2020 by the Company to Enterprise Ireland. |
| **EI Put Options** | the Put Option Deed dated 3rd August 2018 between the Company and Enterprise Ireland and the Put Option Deed dated 3rd August 2018 between the Robert Leslie and Enterprise Ireland. |
| **Enterprise Ireland** | means Enterprise Ireland, The Plaza East Point Business Park Dublin 3. |
| **Fully Diluted Basis** | means the entire issued share capital of the Company from time to time on the assumption that: (a) all options, warrants or similar rights to subscribe or sell for the issue of shares in the capital of the Company whatsoever (whether or not granted on or prior to the date of this Agreement or are granted subsequent to the date of this Agreement) and including for the avoidance of doubt any options granted under any employee share option scheme operated by the Company, are treated for the purpose of this calculation as having been fully exercised in accordance with their respective terms; and (b) any shares in the capital of the Company issuable upon the conversion of any convertible loans or other Securities or instruments convertible into shares in the capital of the Company have been so converted in accordance with the terms of such conversion(s) as set out in the documentation creating the relevant convertible loans or other Securities or instruments. |
| **GG** | Global Growth Ventures Limited, a company incorporated under the laws of British Virgin Islands, with registered number 1843162, having its registered office at Sea Meadow House, Blackburne Highway, P.O. Box 116, Road Town, Tortola, British Virgin Islands. |
| **Group** | means the Company and its subsidiaries (if any) from time to time. |
| **Holding Company** | has the meaning given to that term in Section 8(1) of the Companies Act. |
| **Insolvency Event** | means, in respect of the Company, the occurrence of any of the following events:<br><br>(a) it is dissolved (other than pursuant to a solvent consolidation, amalgamation or merger);<br><br>(b) it becomes insolvent or is unable to pay its debts as they become due within the meaning of section 570 of the Companies Act and such debts are not discharged within 28 days having so become due;<br><br>(c) it makes a general assignment, arrangement or composition with or for the benefit of its creditors;<br><br>(d) it institutes proceedings seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency |

law or other similar law affecting creditors' rights, or an order is made and not set aside for its winding-up or liquidation;

(e)   it has a resolution passed for its winding-up or liquidation (other than pursuant to a solvent consolidation, amalgamation or merger);

(f)   an examiner (or an interim examiner) is appointed or a petition is presented by it to appoint an examiner (or an interim examiner) to it or the protection of the courts is sought by it;

(g)   it seeks or becomes subject to the appointment of a duly appointed provisional liquidator, receiver, examiner, administrator, or other similar official for it or for all or substantially all its assets;

(h)   a secured party takes possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied or enforced on or against all or substantially all its assets;

(i)   it causes or is subject to any event with respect to it, which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (h) above; or

(j)   it takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

| | |
|---|---|
| **Integra Investors** | means the persons set out in Part C of Schedule 1. |
| **Integra Investor Shares** | has the meaning given to such term as it set out in Recital J. |
| **Integra Subscription Agreement** | means the subscription agreement entered into on or about the Effective Date between the Company and the Integra Investors relating to the subscription for, and issue of, the Integra Investor Shares. |
| **In-Q-Tel** | means In-Q-Tel, Inc of 2107 Wilson Blvd., 11th Floor, Arlington, VA 22201, United States of America. |
| **IQT Conversion Shares** | has the meaning given to such term in Recital F. |
| **IQT Loan Notes** | means the loan notes constituted under the loan note instrument issued on 29 March 2019 by the Company to In-Q-Tel as amended from time to time. |
| **Loan Notes** | means the EI Loan Notes, IQT Loan Notes, the TWF Loan Notes and the SVD Loan Notes. |
| **Mentoring Services** | has the meaning given to such term in clause 12.2.1. |
| **MH** | Martin Haemmig of |
| **MP** | Maurice Pedergnana of |
| **New Constitution** | means the new constitution of the Company adopted on or about the Effective Date as attached hereto as Schedule 7. |
| **New Shareholder** | has the meaning given to such term in clause 5. |

| | |
|---|---|
| **NUIG** | National University Of Ireland Galway of University Road, Galway, Ireland. |
| **NUIG Licence Agreement** | means the licence agreement entered into by the Company and NUIG dated 1 September 2015. |
| **NUIG Shares** | has the meaning given to such term in clause 6.5. |
| **NYC Investors** | means the persons set out in Part D of Schedule 1. |
| **NYC Investor Shares** | has the meaning given to such term in Recital I. |
| **NYC Subscription Agreement** | means the subscription agreement entered into on or about the Effective Date between the Company and the NYC Investors relating to the subscription for, and issue of, the NYC Investor Shares. |
| **Observer** | has the meaning given to such term in clause 3.2. |
| **Original Parties** | means Robert Leslie, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Sedicii Employee Share Participation Program, ▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Original Agreement** | means the subscription and shareholder's agreement dated 7 July 2017 between (1) Robert Leslie ▮▮▮▮▮▮▮▮▮▮ (3) the Company ▮▮▮▮▮▮ (5) Sedicii Employee Share Participation Progra▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ together with any other person who has subsequently agreed to adhere to the agreement as if they were a party. |
| **Ordinary Shares** | has the meaning given to such term in Recital B. |
| **Preferred Ordinary Shares** | has the meaning given to such term in Recital B. |
| **Proposed Transferors** | has the meaning given too such term in clause 6.2. |
| **Proposed Transferee** | has the meaning given to such term in clause 6.2. |
| **Privileged Relation** | means a Shareholder's father or mother or to any lineal descendant of his father or mother or to his spouse or life partner but only to children aged eighteen or over. |
| **Relevant Date** | has the meaning given to such term in clause 7.3. |
| **Relevant Shares** | means all the Shares in the capital of the Company held by an Shareholder or by a nominee on behalf of such Shareholder together with any shares in the capital of the Company held by any transferee of an Shareholder in respect of any transfer made pursuant to the Articles and all rights and interests therein. |
| **Sean Van Den Haute** | means Sean Van Den Haute of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **SVD Conversion Shares** | has the meaning given to such term as it set out in Recital G. |
| **SVD Loan Notes** | means the loan notes constituted under the loan note instrument issued on 8 May 2019 by the Company to Sean Van Den Haute as amended from time to time. |

| **Securities** | means equity and/or debt securities in the capital of the Company to include Shares and/or any instruments such as convertible loans or other equity and/or debt securities convertible into Shares. |
| --- | --- |
| **Shareholders** | means the holders of the Shares for the time being and "**Shareholder**" means any one of them. |
| **Shares** | means the Ordinary Shares, the Preferred Ordinary Share and any other the shares of any class in the capital of the Company from time to time. |
| **Shareholder Majority** | means the holders of not less than 66.6666% of the issued Shares at the relevant time. |
| **Subsidiary** | has the meaning given to that term in Section 7(2) of the Companies Act. |
| **Termination Date** | means the date on which a Shareholder ceases to be beneficially interested in any Shares (regardless of class) in the capital of the Company. |
| **Transfer Notice** | means the notice to be given (or deemed to be given) by a member to the Company pursuant to regulation 15 of the Constitution. |
| **Twilightford** | means Twilightford Unlimited Company, a company registered in Ireland under company number 517526 and having its registered office at 15 Main Street, Dublin 5, Raheny, Dublin, D05 X006, Ireland. |
| **TWF Conversion Shares** | has the meaning given to such term as is set out in Recital H. |
| **TWF Loan Notes** | means the loan notes constituted under the loan note instrument issued on 31 January 2019 by the Company to Twilightford as amended from time to time. |
| **Z2B** | means Zone2Boost, S.L. |
| **Z2B Competitor** | means any of the following: BancoSantander, BBVA and Banco Sabadell. |

1.2     In this Agreement, unless the context otherwise requires:

1.2.1     Any reference to a document being "in approved terms" or in "agreed form" or similar means in relation to that document, the form agreed and which has been annexed to this Agreement for the purposes of identification.

1.2.2     The contents of the Schedules form an integral part of this Agreement and any reference to "this Agreement" shall be deemed to include the Schedules.

1.2.3     Headings are for convenience only and shall not affect the construction or interpretation of this Agreement.

1.2.4     Any reference to a clause, paragraph or Schedule shall be a reference to a clause, paragraph or Schedule of this Agreement.

1.2.5     Any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.2.6     A reference to any gender includes all genders and words in the singular include the plural and

vice versa.

1.2.7 Any reference to a person shall be construed so as to include any individual, firm, company, corporation, government, state or agency of a state or any joint venture, association, partnership, works council or employee representative body (whether or not having separate legal personality).

1.2.8 Any reference to any statute, statutory provisions or to any order or regulation shall be construed as a reference to:

(a) that statute, provision, order or regulation as extended, amended, replaced or re-enacted from time to time (whether before or after the date of this Agreement);

(b) all statutory instruments made under it or deriving validity from it (whether before or after the date of this Agreement);

(c) any statutory instruments made under any enactment to be read and/or construed with any such statute, statutory provisions, order or regulation;

(d) any rules made by competent authorities under or pursuant to a statutory instrument.

1.2.9 Any reference to Ireland does not include Northern Ireland.

1.2.10 "Writing" or any similar expression includes transmission by email.

1.2.11 If any action or duty to be taken or performed under any of the provisions of this Agreement would fall to be taken or performed on a day which is not a Business Day, that action or duty shall be taken or performed on the Business Day next following that date.

1.2.12 The parties acknowledge and agree that this Agreement has been jointly drafted by the parties and accordingly it shall not be construed strictly against any party.

2. **COMPLETION**

2.1 On the Effective Date, all but not some only of the following shall take place (to the extent that they have not taken place prior to the Effective Date):

2.1.1 the Company shall adopt the New Constitution;

2.1.2 the Integra Investors and the Company shall enter into and complete the Integra Subscription Agreement;

2.1.3 the NYC Investors and the Company shall enter into and complete the NYC Subscription Agreement;

2.1.4 each of the Converted Shareholders shall convert all outstanding sums under their respective Loan Notes (including principal and interest) into the relevant Conversion Shares and such Loan Notes and/or other shareholders agreements shall be thereby terminated and cease to have effect;

2.1.5 the Company shall:

(a) pursuant to the Integra Subscription Agreement:

2.1.5.1 allot and issue the Integra Shares to the Integra Investors credited as fully paid;

2.1.5.2 enter each of the Integra Investors in the register of members of the Company

as the holders of such number of shares and issue and deliver to the each of the Integra Investors a share certificate duly executed by the Company in respect of the shares issued to each of them; and

(b)     pursuant to the NYC Subscription Agreement:

2.1.5.1     allot and issue the NYC Investor Shares to the NYC Investors credited as fully paid; and

2.1.5.2     enter the NYC Investors in the register of members of the Company as the holder of such number of shares and issue and deliver to each of the NYC Investors a share certificate duly executed by the Company in respect of the shares issued to each of them.

(c)     upon conversion of the Loan Notes aforesaid and without requiring the Converted Shareholders to make any further payment to the Company:

2.1.5.1     allot and issue the relevant Conversion Shares to the relevant Converted Shareholder credited as fully paid;

2.1.5.2     enter each of the Converted Shareholders in the register of members of the Company as the holder of such number of shares and issue and deliver to each of the Converted Shareholders a share certificate duly executed by the Company in respect of the shares issued to each of them.

2.1.6     each of the Integra Investors, the NYC Investors, In-Q-Tel and Twilightford shall sign a deed of adherence to this Agreement.

2.2     Each of the Existing Shareholders hereby irrevocably waive all pre-emption rights conferred on them (whether by the Companies Act, the Constitution of the Company or otherwise) in relation to Shares to be issued pursuant to, and in accordance with, this Agreement.

2.3     A capitalisation table agreed between the parties showing the shareholding in the Company (calculated on a Fully Diluted Basis) immediately after Completion is set out at Schedule 1.

3.     **BOARD DIRECTOR AND BOARD OBSERVER**

3.1     For so long as any Shareholder holds any Shares which represent at least 10% of the total issued Shares in the capital of the Company, such Shareholder shall be entitled to nominate one person as a Director to the Board and remove from office any person so appointed and to appoint another person in his place. Each Director so appointed shall have the right to be appointed to (i) any committee or sub-committee of or established by the Board (or any committee thereof). Accordingly each of the Parties hereto shall exercise such voting rights as for the time being they may have in each of the Company and take such other steps as for the time being lies within their power to secure at the request of the relevant Shareholder the appointment, removal or replacement as director of any such nominee.

3.2     For so long as any Shareholders hold any Shares which represent at least 5% of the total issued Shares in the issued share capital of the Company, such Shareholder shall be entitled to appoint and the Company shall accept with effect from the date of this Agreement the appointment of an observer (each, an "**Observer**").  The Observer shall be entitled to receive notice of, and attend at and speak, but not vote, at meetings of the Board of the Company and a meeting of the Board shall not be validly convened unless such notice has been provided.  The Observer shall not receive any remuneration and/or expenses for attending Board meetings.

3.3     Notwithstanding clause 3.2, for so long as GG, MP and NUIG holds any Shares in the capital of the Company, GG, MP, NUIG and MH shall be entitled to appoint and the Company shall accept with

effect from the date of this Agreement the appointment of an Observer. The Observer shall be entitled to receive notice of, and attend at and speak, but not vote, at meetings of the Board of the Company and a meeting of the Board shall not be validly convened unless such notice has been provided.  The Observer shall not receive any remuneration and/or expenses for attending Board meetings.

4.    **TRANSFER AND/OR ALLOTMENT OF SHARES/ANTI-DILUTION**

4.1    Any allotment and/or transfer or purported allotment transfer of Shares made otherwise than in accordance with the provisions of the Constitution, shall be void and of no effect whatsoever and the Company and each of the Shareholders (save for Enterprise Ireland) shall procure that the Board shall not register such allotment and/or transfer.

4.2    Subject to clause 4.3, each of the Shareholders undertake with the others that, during the continuance of this Agreement, none of them shall:

4.2.1    mortgage (whether by way of fixed or floating charge) pledge or otherwise encumber any legal or beneficial interest it may have in any of its Shares;

4.2.2    sell, transfer or otherwise dispose of all or any of its Shares or any legal or beneficial interest therein or assign or otherwise purport to deal therewith or with any interest therein (other than NUIG which shall be entitled to transfer its Shares to a company which is wholly controlled by it and Enterprise Ireland provided that the transfer complies with the Constitution);

4.2.3    enter into any agreement in respect of the voting rights attached to all or any its Shares;

4.2.4    agree, whether conditionally or otherwise, to any of the foregoing,

4.2.5    other than, in any case, with the consent in writing of the Board of the Company

4.3    Permitted Transfers

4.3.1    Any Shareholder, being a body corporate, shall be permitted at any time to transfer any Share or Shares to an Affiliate PROVIDED THAT:

(a)    the transferee executes and delivers to the Company and to the other Shareholders a Deed of Adherence prior to registration of the transfer whereby the transferee becomes bound by the Agreement on the same basis as the transferor; and

(b)    if such transferee subsequently ceases to be an Affiliate, then prior to ceasing to be an Affiliate, such transferee shall be obliged to transfer the Shares to another entity who remains an Affiliate of the transferor.

4.3.2    Any Shareholder may transfer Shares to a Privileged Relation but such a transfer shall be subject to the Privileged Relation entering into a Deed of Adherence.

4.3.3    Any Shareholder may transfer Shares to a director, employee or contractor of the Company but such a transfer shall be subject to the director, employee or contractor entering into a Deed of Adherence.

4.3.4    Enterprise Ireland may transfer its Shares pursuant to the EI Put Options.

4.3.5    Enterprise Ireland may transfer its Shares to any Minister of the Irish Government or person nominated by any Minister of the Irish Government or by any of the foregoing to any of the foregoing (whether by reason of any act of the Oireachtas, ministerial order or any requirement under EU legislation.

4.3.6    The Shareholders waive all and any rights of pre-emption they might have on the occasion of a transfer under this Clause 4.3.

4.3.7    For the avoidance of doubt, Robert Leslie may sell, transfer or otherwise dispose of all or any of his Shares or any legal or beneficial interest therein or assign or otherwise purport to deal therewith or with any interest therein for the purpose of securing contracts of employment with directors, employees and contractors, subject to the director, employee or contractor entering into a Deed of Adherence.

5.    **DEED OF ADHERENCE**

No Securities shall be allotted or transferred to any person who is not already a party to this Agreement (a "**New Shareholder**") unless at the time of or prior to such allotment or transfer he (or if he is a nominee of another person, that other person) enters into a Deed of Adherence. In the case of Enterprise Ireland its transferee would adhere on the same basis as it holds shares.

6.    **TRADE SALE / TAG ALONG / DRAG ALONG**

6.1    The Shareholders (save for Enterprise Ireland) hereby covenant and undertake that in the event of any of them receiving any offer for the purchase of all or any of their shares in the capital of the Company and wishing to accept such offer then notwithstanding any provision of this Agreement or anything contained in the Constitution they shall procure that it shall be an express term of any such agreement for the sale and purchase of their said shares or any of them, that the other Shareholders shall have the option (for a period of thirty days after receiving written notice of such offer) of selling to the purchaser thereof at the same time the same proportion of the Shares in the capital of the Company held by the Shareholder receiving such offer as the proportion being sold by such Shareholder and upon the same terms.

6.2    Where an offer has been received to acquire Shares comprising more than 75% of the issued share capital of the Company and the members holding 75% or more of the entire issued share capital of the Company in nominal value (the "**Proposed Transferors**") accept such offer in respect of the transfer of all (but not some only) of their respective shareholdings of such shares to the purchaser (the "**Proposed Transferee**"), the Proposed Transferors may require that each other Shareholder of the Company sell to the Proposed Transferee at the same time and on the same commercial terms received by the Proposed Transferors all (but not some only) of the Shares then held by such other Shareholder at the price offered by the Proposed Transferee (being the same price per share as offered to the Proposed Transferor) making the notification referred to at Clause 6.3 below ("**Drag-Along Right**"), provided this right may not be exercised unless (1) the price per share shall be the price that would be paid in a bargain for value negotiated at arm's length  and (2) the transaction between the Proposed Transferor and the Proposed Transferee has been negotiated on a fully arms-length basis. Each other Shareholder of the Company agrees to take all steps necessary to enable it or him to comply with the provisions of this Clause 6.2 and to facilitate the Proposed Transferor's exercise of a Drag-Along Right.

6.3    To exercise a Drag-Along Right, the Proposed Transferor shall give each other Shareholder of the Company a written notice (for the purpose of this Clause 6.3, a ("**Drag-Along Notice**") containing (i) the name and address of the Proposed Transferee and (ii) the price per Share offered, the terms of payment and other material terms and conditions of the Proposed Transferee's offer). Each other holder of Shares shall thereafter be obliged to sell its Shares on the same terms and conditions as the Proposed Transferor and on such terms and conditions as are contained in the Drag-Along Notice, provided that the sale to the Proposed Transferee by the Proposed Transferor is completed within 120 days after delivery of the Drag-Along Notice. If the sale is not completed within such 120 day period, then each such other Shareholder of the Company shall no longer be so obliged.

6.4    If a Shareholder (other than NUIG and Enterprise Ireland) shall fail or refuse to transfer any Shares in accordance with its obligations hereunder, the Company may authorise some person to

execute and deliver and perform on its behalf all such documentation, acts, deeds, consents, transfers and other matters necessary (and the Shareholder (other than the National University of Ireland Galway and Enterprise Ireland) hereby irrevocably consents to the appointment of such person as his attorney) and the Company may receive the purchase money in trust (but without interest) for the Shareholder until he or they deliver up his or their Share certificates for the Shares so transferred and cause the Proposed Transferee to be registered as the holders of such Shares. The receipt by the Company of the purchase money shall be a good discharge to the Proposed Transferee.

6.5    NUIG shall not be required to give any warranty or indemnity in relation to any sale of shares held by it in the Company ("**NUIG Shares**") other than title to the NUIG Shares and capacity and authority to enter into such agreements as it may agree to enter into and Enterprise Ireland shall not be required to give any warranty or indemnity in relation to any sale of shares held by it in the Company ("**EI Shares**"), in the context of a sale under clause 6.2 or otherwise, other than title to the EI Shares and capacity and authority to enter into such agreements as it may agree to enter into.

7.    **TRANSFERS ON CEASING TO BE AN EMPLOYEE**

7.1    In this Clause 7.1 "**Bad Leaver**" means Robert Leslie who has ceased, at the relevant time, to be engaged to the full extent required by his or her contract of employment with the Company by reason of (i) the termination of his or her contract of employment by the Company on account of a breach thereof by the Shareholder and, if the Shareholder has brought a claim for wrongful or unfair dismissal in relation to such termination, it has not been duly adjudged as such, or (ii) his voluntary resignation as an employee of the Company  (other than for reasons of death or ill health which is such as to render him or her unable to fulfil his or her duties under his or her contract of employment, provided that such ill health is not caused by abuse of either drugs or alcohol). For the avoidance of doubt the resignation of Robert Leslie as an officer of the Company will not result in such Shareholder being considered a Bad Leaver.

7.2    In the event that Robert Leslie ceases to be an employee of the Company in circumstances which constitute him a Bad Leaver, he shall thereupon serve a Transfer Notice under the Constitution (a "**Transfer Notice**") in respect of all of his Relevant Shares.

7.3    A Transfer Notice under this sub-clause shall be given on the date on which the Shareholder concerned ceased to be an employee as aforesaid (the "**Relevant Date**") provided that if the Shareholder fails to give such a Transfer Notice on the Relevant Date, any Director of the Company shall be and is hereby irrevocably appointed as the attorney of such Shareholder for the purposes of giving the same forthwith or at such time as the Board shall deem appropriate (notwithstanding any provision of the Articles) and doing all things and executing all such instruments as may be necessary or desirable in connection therewith.

7.4    Any transfer pursuant to this sub-clause at any time by a Bad Leaver shall be at a price equal to the share price as ascertained during the last formal valuation of the Company subject to a reduction of 10%.  The Board, at its sole discretion, shall have the right to commission an up to date valuation of the Company in the event of a Bad Leaver, which valuation shall be carried out by the Auditors and shall be effective for the purposes of this Clause 7.4.

7.5    In the event that all or some of the Relevant Shares are not transferred by the Bad Leaver under the Transfer Notice due to a failure of the Board to secure a purchaser under the Constitution those Relevant Shares yet to be transferred (the "**Remaining Shares**") shall be retained by the Bad Leaver but any Director shall be and is hereby irrevocably appointed as the attorney of such Bad Leaver for the purposes of doing all things and executing all such instruments as may be necessary or desirable in connection with the Remaining Shares. The Board and the remaining Shareholders shall endeavour to secure a purchaser for the Remaining Shares at a value not less than the value ascertained under Clause 7.4 above.

7.6    Where immediately following such a transfer the relevant Shareholder remains the registered holder of Shares in the capital of the Company or there are Shares held on his behalf, such Shareholder shall not exercise any voting rights attached to such Shares which rights shall vest in and be exercisable by the chairman of the board of directors of the Company.

8.    **TRANSFER ON TERMINATION OF THE NUIG LICENCE AGREEMEN**T

8.1    In the event that NUIG and the Company agree in writing to terminate the NUIG Licence Agreement at any time without cause, NUIG may, but shall not be obliged to, serve a Transfer Notice (as defined in the Constitution) in respect of NUIG Shares in which case the provisions of this Clause 8 shall apply.

8.2    A Transfer Notice under Clause 8.1 above may be served at any time within 20 Business Days of the date on which the parties agree in writing to terminate the NUIG License Agreement.

8.3    Any transfer pursuant to a Transfer Notice under this Clause 8 shall be at a price equal to the premium value of the NUIG Shares at the time of subscription.

8.4    In the event that NUIG terminates the Licence Agreement at any time due to a material breach ("**Breach Termination**") NUIG may (but shall not be obliged to) serve a Transfer Notice in respect of all of the NUIG Shares. Any transfer pursuant to a Transfer Notice resulting from a Breach Termination shall be at a price equal to the premium value of the NUIG Shares at the time of subscription or the Fair Value of the NUIG Shares, whichever is greater, without prejudice to any right or remedy NUIG might otherwise have pursuant to this Agreement and/or the NUIG Licence Agreement. Subject to the provisions of the Companies Act being adhered to and subject to Board approval for the acquisition being obtained, the Company shall purchase the NUIG Shares at the greater of their premium value at the time of subscription or their Fair Value at the date of termination under this Clause 8.4.

9.    **APPROVAL OF CERTAIN MATTERS**

9.1    The business of the Company will be controlled by its board of directors and the Company will not enter into any contract, arrangement or transaction whereby any business of the Company would be controlled otherwise, provided however that the Shareholders (other than Enterprise Ireland) shall exercise (or otherwise procure that there shall be exercised) all voting rights and other powers of control available to such party in relation to the Company so as to procure (insofar as such party is able to do so by the exercise of those rights and powers), and the Company shall do everything necessary within its power to procure, that at all times during the term of this Agreement, other than pursuant to this Agreement (or any matter already approved pursuant to this clause 9), none of the matters set out in Schedule 3 occurs without the approval of the Board and the agreement of the Shareholder Majority (in the case of the latter, such agreement to be granted either in writing, at a meeting of the Shareholders or with the consent of the Directors appointed by such Shareholders at a meeting of the Board, such agreement not to be unreasonably withheld, conditioned or delayed).

9.2    For so long as Z2B holds any Shares, the Shareholders (other than Enterprise Ireland) shall exercise (or otherwise procure that there shall be exercised) all voting rights and other powers of control available to such party in relation to the Company so as to procure (insofar as such party is able to do so by the exercise of those rights and powers) and the Company shall do everything necessary within its powers to procure that at all times during the term of this Agreement, other than pursuant to this Agreement (or any matter already approved pursuant to this clause 9) none of the matters set out in Schedule 4 occurs without the approval of the Board and Z2B. In circumstances where such approval is required of Z2B, such agreement may be granted in writing, at a meeting of the Shareholders or with the consent of a Director appointed by Z2B at a meeting of the Board, such agreement not to be unreasonably withheld, conditioned or delayed.

9.3    For so long as Enterprise Ireland holds any Shares, the Shareholders shall exercise (or otherwise

procure that there shall be exercised) all voting rights and other powers of control available to such party in relation to the Company so as to procure (insofar as such party is able to do so by the exercise of those rights and powers) and the Company shall do everything necessary within its powers to procure that at all times during the term of this Agreement, that the Company shall comply with the terms of Schedule 5.

10.   **INFORMATION AND CONFIDENTIALITY**

10.1   Rights to Information

10.1.1   The Company shall keep the Shareholders fully informed of the progress of the business of the Company and shall furnish to the Shareholders to such extent and in such form and detail as may from time to time be reasonably required by each Shareholder particulars of any matters concerned with and arising out of the activities of the Company and in particular the Company:

(a)   shall furnish to each Shareholder within 180 days of the end of each financial year of the Company, the financial statements including balance sheets and profit and loss accounts in respect of the financial year of the Company then most recently ended together with the directors' reports thereon.

(b)   shall furnish to each Shareholder within 30 days before the end of each financial year of the Company projected balance sheets, profit and loss accounts and cash flow statements for the Company in respect of the next financial year.

(c)   shall ensure that each Shareholder (for so long as they hold any Shares in the capital of the Company) shall be entitled at its own cost and expense at all reasonable times during normal business hours to reasonable access to inspect, examine and copy any books, files, records and other documents belonging to or maintained by or on behalf of the Company relating to its business affairs or financial position and to reasonable access to the properties, buildings and other assets of the Company where any such records are kept for the time being, which access rights shall be subject to the obligations of confidentiality set out herein.

10.2   Confidentiality

Subject to Clause 10.1 and save as required by law or by any relevant national or supranational regulatory authority, each of the Shareholders (other than NUIG and Enterprise Ireland) shall safeguard, treat as confidential, and not use for the purpose of its own business any Confidential Information, documents and materials which it requires in connection with this Agreement and which relate to the Business of the Company or to any of the other Parties.

10.3   Survival

The obligations of confidentiality in this Clause 10 shall survive the termination of this Agreement and shall continue unless and until any of the relevant confidential information enters the public domain through no fault of the relevant party or of any other person (under the control of such Shareholder) owing a duty of confidentiality to the Company.

10.4   Books and Records

All books, diaries, documents, letters, papers, lists of customers, memoranda or communications in writing which the Shareholders shall have made, shall make or cause to be made, shall have received or shall receive from the Company or any officer thereof or which shall by any other means have come or come into his hands or any matters relating to the affairs or customers or the Company shall be treated as confidential and shall be and remain the property of the Company. This clause 10.4 shall not apply to Enterprise Ireland.

7893303.11

10.5    Delivery Up

A Shareholder which ceases to be a Shareholder shall thereupon forthwith hand over to the Company all confidential information, documents and correspondence belonging to or relating to the business of the Company and shall, if so required by the Company, certify that it has not kept records or copies thereof unless such Shareholder can show to the satisfaction of the Board that the Shareholder is required to maintain a record of the confidential information, documents and correspondence in relation to their finances and accounts or under other obligation of law. This clause 10.5 shall not apply to Enterprise Ireland.

11.    **CONDUCT OF THE BUSINESS**

11.1    Except as the Shareholders may otherwise agree in writing or save as otherwise expressly permitted by this Agreement the Shareholders (save for Enterprise Ireland) shall exercise their powers in relation to the Company so as to ensure that:

11.1.1    the Company carries on and conducts its business and affairs in a proper and efficient manner and for its own benefit;

11.1.2    the Company transacts all its business on arm's length terms;

11.1.3    all business of the Company, other than routine day to day business, shall be undertaken and transacted by the Directors;

11.1.4    the business of the Company shall be carried on pursuant to policies laid down from time to time by the Directors;

11.1.5    the Company shall maintain with a well-established and reputable insurer adequate insurance against all risks usually insured against by companies carrying on the same or a similar business and (without prejudice to the generality of the foregoing) for the full replacement or reinstatement value of all its assets of an insurable nature, and in each case subject to such levels of self-insurance as a prudent person in the position of the Company would chose;

11.1.6    the Company allots and issues its shares and other securities at the best price reasonably obtainable in the circumstances;

11.1.7    the Company shall not acquire, dispose of, hire, lease, license or receive licences of any assets, goods, rights or services otherwise than at the best price reasonably obtainable in the circumstances;

11.1.8    the Company shall keep proper books of account and therein make true and complete entries of all its dealings and transactions of and in relation to its business;

11.1.9    the Company shall prepare its accounts on an historical cost basis and shall adopt such accounting policies as may from time to time be generally accepted in Ireland;

11.1.10    the Company shall prepare such accounts in respect of each accounting reference period as are required by statute and procure that such accounts are audited as soon as practicable and in any event not later than 90 days after the end of the relevant accounting reference period;

11.1.11    each accounting reference period of the Company shall be a period of 12 calendar months; and

11.1.12    if the Company requires any approval, consent or licence for the carrying on of its business in the places and in the manner in which it is from time to time carried on or proposed to be carried on the Company will use its best endeavours to maintain the same in full force and effect.

12.    **RESTRICTIONS**

12.1    No Competing Business

The Shareholders (other than NUIG and Enterprise Ireland) shall not and shall procure, to the extent that they are able, that Connected Persons shall not, during the term of this Agreement and at any time before the expiry of two years from the Termination Date (and whether on their own behalf or in conjunction with or on behalf of any other person), in any way, whether as principal, agent, partner, shareholder, director, manager, adviser, consultant, employee or otherwise howsoever, whether directly or indirectly, be concerned or take part in the carrying on of any business which can reasonably be regarded as being or likely to be in direct competition with the Business or any business which the Shareholder concerned knows that the Company intends to commence.

12.2    Nothing contained in this clause 12 shall prevent:

12.2.1  Stuart Hillston from providing mentoring services ("**Mentoring Services**") to a number of start-up companies in the same Business as the Company;

12.2.2  Robert Leslie from being a shareholder of Kyckr Limited (ASX:KYK) which provides anti-money laundering and KYC services on businesses; and

12.2.3  any of the Shareholders from becoming involved in creating a new digital asset business known as the Nillon Network that will license the Company's technology to develop a new digital token for use in the decentralised internet.

12.3    Non-Solicitation

(a)    Without prejudice to their common law duties (if any) the Shareholders (other than NUIG and Enterprise Ireland) shall not, and shall procure, to the extent that they are able, that Connected Persons shall not, at any time whilst a Shareholder and in the event of ceasing to be an Shareholder or employee of the Company before the expiry of two years from the Termination Date

(b)    in any way, whether directly or indirectly, try to obtain any business from any person who, during the preceding twelve months, was a customer or a supplier of the Company provided that this restriction shall apply in the case of suppliers only where alternative sources of supply on equivalent terms would not be generally available to the Company or where the interference of any supplies by any such suppliers to the Company may be anticipated to cause significant damage to the Company; o

(c)    in any way, whether directly or indirectly, solicit or invite any person who, as at the Termination Date is or was in the preceding twelve months an employee of the Company who is employed in skilled, contract, design, technical or managerial work to become an employee of or in any other way associated in business with the Shareholder or any of their Connected Persons of that Shareholder.

12.4    Confidentiality

Each Shareholder (other than NUIG) undertakes that he shall not at any time after the date of this Agreement use, divulge or communicate to any person (except to his personal representatives or advisers or as may be required by law or any legal or regulatory authority) any confidential information concerning the business and affairs of the other Shareholders or the Company which may have or may in future come to his knowledge, and each of the Shareholders (other than NUIG) shall use his reasonable endeavours to prevent the publication or disclosure or any confidential information concerning such matters. The terms and conditions of this Agreement including their existence, shall be considered confidential information and shall not be disclosed by any party or to any third party without the prior written consent of the Shareholders. This

clause 12.4 shall not apply to Enterprise Ireland.

12.5     Indemnity for Breach of Restrictions

Each Shareholder (other than NUIG and Enterprise Ireland) undertakes fully to indemnify the other parties to this Agreement in respect of any loss which they may incur as a result of a failure by them to comply with any of the provisions of this clause 12. For the avoidance of doubt, NUIG and Enterprise Ireland are not providing any warranty or indemnity pursuant to this Agreement.

13.     **NOTICES**

13.1     Any notice to be given under this Agreement shall either be delivered personally or sent by registered post. The address for service shall be the address set out for such party in Schedule 1 (or such other address as he or she may from time to time designate to all other parties hereto in accordance with the provisions of this clause).  A notice shall be deemed to have been served as follows:

13.1.1     if personally delivered, at the time of delivery; or

13.1.2     if posted, the date of posting.

13.2     To prove personal service it shall be sufficient to prove that personal delivery was made and in the case of posting, it shall be sufficient to produce the certificate of postage.

14.     **GENERAL**

14.1     Prior Claims

Each of the Original Parties (i) acknowledges and agrees that such Original Party has no claim outstanding against another party pursuant to the Original Agreement prior to the date of this Agreement and (ii) hereby waives and relinquishes any and all rights pursuant to any warranty and/or indemnity contained in the Original Agreement prior to the date of this Agreement.

14.2     Further assurance

At the request of any one of the parties, all the other parties (other than Enterprise Ireland) shall and shall procure that the Company and any other necessary parties shall execute and do all such necessary documents, acts and things as may reasonably be required subsequent to the First Tranche Completion by that party for the purposes of giving effect to the terms of this Agreement and the Constitution.

14.3     Obligations of Shareholders

Each Shareholder (save for Enterprise Ireland) shall exercise all voting rights and other powers of control available to him in relation to the Company so as to procure (so far as each is respectively able) that, at all times during the term of this Agreement, the provisions of this Agreement are duly and promptly observed and given full force and effect according to its spirit and intention.

14.4     Costs and Expenses

Each party shall pay any costs, fees or expenses incurred by it in connection with this Agreement and the documents referred to in it.

14.5     Successors and Assigns

14.5.1     None of the parties may assign their rights or obligations in whole or in part under this Agreement without the prior written consent of the other parties save in respect of a transfer under clause

4.3.5.

14.5.2   This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors, personal representatives and permitted assigns.

14.6   Counterparts

This Agreement may be executed in any number of counterparts and by the different parties on separate counterpart, each of which when executed shall constitute an original, all the counterparts together constituting the same agreement.

14.7   Waiver

No failure or delay by a party to exercise any right or remedy provided under this agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it preclude or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall preclude or restrict the further exercise of that or any other right or remedy.

14.8   Severance

14.8.1   Each of the provisions of this Agreement (and each part of each provision) is separate and severable and enforceable accordingly and if at any time any provision (or part of a provision) is adjudged by any court or administrative body of competent jurisdiction to be void or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement or the remainder of that provision or of that provision in any other jurisdiction shall not in any way be affected or impaired by that judgment.

14.8.2   If any provision of this Agreement (or part of a provision) transpires not to be enforceable against any of the parties, that non-enforceability shall not render that provision unenforceable against any other party.

14.8.3   If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it would be deleted, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the parties and the parties consent to a court of competent jurisdiction giving effect to a provision in such modified form as may be decided by that court.

14.9   Variation

No variation of this Agreement shall be made without the prior written consent of both the Company, Shareholder Majority and Enterprise Ireland. A variation of this Agreement is valid only if it is in writing and executed by or on behalf of each of the parties.

14.10   Entire Agreement

This Agreement and the Constitution constitutes the entire agreement, and supersedes any previous agreements, between the parties relating to their subject matter.

14.11   Conflict with Other Documents

In the event of any conflict between the terms of this Agreement and the Constitution, the parties agree that as between themselves, but not so as to amend the Constitution, the provisions of this Agreement shall prevail and without prejudice to the other provisions of this clause 14.11, the Parties hereby irrevocably consent to the making of any amendment to the Constitution necessary to render them in accordance with the terms of this Agreement.

14.12   No Partnership

7893303.11

This Agreement shall not be deemed to create any partnership between the Parties in relation to the Company or otherwise.

14.13    Independent Legal Advice

The parties acknowledge that they have been afforded the opportunity to take independent legal advice on the terms of this Agreement prior to entering into it.  Each Party further acknowledges that it/he/she understands the effect and implications of this Agreement and that it/he/she has entered into this Agreement without any coercion of any description.

14.14    Law and Jurisdiction

14.14.1  This Agreement and any dispute arising from it shall be governed by and construed in accordance with the laws of Ireland.

14.14.2  Each of the Parties hereto irrevocably and unconditionally submits to the non-exclusive jurisdiction of the courts of Ireland for any of the purposes of this Agreement.

14.15    Amendment and Restatement

With effect on and from the execution of this Agreement, the Original Agreement, shall be amended and restated in the manner set out in this Agreement so that the rights and obligations of the parties to the Original Agreement shall be governed by and construed in accordance with the terms set out in this Agreement.

**IN WITNESS** whereof the parties have entered into and delivered this Agreement as a Deed on the day and year set out at the start of this Agreement.

**SCHEDULE 1 – THE SHAREHOLDERS**

**Part A – The Existing Shareholders**

| Name | Address | Number of Ordinary Shares | Number of Preferred Ordinary Shares |
|---|---|---|---|
| Robert Leslie | | 1,512,000 | 0 |
| Sedicii Employee Share Participation Program | Arclabs ResearchCentre, WIT West Campus, Carriganore, Waterford, Ireland | 270,000 | 0 |
| | | 18,000 | 0 |
| | | 200,000 | 0 |
| | | 20,000 | 0 |
| | | 343,400 | 0 |
| | | 101,000 | 0 |
| | | 102,290 | 0 |
| | | 33,670 | 0 |
| | | 67,330 | 55,511 |
| | | 11,116 | 0 |
| | | 4,635 | 0 |
| TOTAL | | 2,683,441 | 0 |

**Part B – The Converted Shareholders**

| Name | Address | Number of Ordinary Shares | Number of Preferred Ordinary Shares |
|---|---|---|---|
|  |  | 136,752 | 0 |
|  |  | 136,074 | 0 |
|  |  | 67,330 | 55,511 |
|  |  | 0 | 62,209 |
| TOTAL |  | 340,156 | 117,720 |

**Part C – The Integra Investors**

| Name | Address | Number of Ordinary Shares | Number of Preferred Ordinary Shares |
|---|---|---|---|
|  |  | 2,223 | 0 |
|  |  | 2,223 | 0 |
|  |  | 2,223 | 0 |
|  |  | 4,446 | 0 |
|  |  | 1,111 | 0 |
|  |  | 1,112 | 0 |
|  |  | 1,111 | 0 |
|  |  | 1,112 | 0 |
|  |  | 44,462 | 0 |
|  |  | 2,223 | 0 |

| | | | |
|---|---|---|---|
| | | | |
| | | 11,116 | 0 |
| | | 11,116 | 0 |
| | | 4,446 | 0 |
| | | 4,446 | 0 |
| | | 2,223 | 0 |
| | | 2,668 | 0 |
| | | 4,669 | 0 |
| | | 5,558 | 0 |
| Unworq LLC | Florida, USA 33496 | 4,446 | 0 |
| | | 5,558 | 0 |
| Murad Khan | New York, NY 10014, USA | 5,558 | 0 |
| Kyle Armour | San Juan, Puerto Rico, 00901 | 2,223 | 0 |
| | | 741 | 0 |
| | | 741 | 0 |
| | | 741 | 0 |
| | | 4,669 | 0 |



| | | | |
|---|---|---|---|
| | | 2,445 | 0 |
| TOTAL | | 135,610 | 0 |

**Part D – The NYC Investors**

| Name | Address | Number of Ordinary Shares | Number of Preferred Ordinary Shares |
|---|---|---|---|
| | | 82,255 | 0 |
| | | 35,570 | 0 |
| | | 6,669 | 0 |
| | | 13,339 | 0 |
| | | 18,452 | 0 |
| | | 7,781 | 0 |
| | | 22,231 | 0 |
| | | 5,558 | 0 |
| TOTAL | | 191,855 | 0 |

## SCHEDULE 2 – COMPANY INFORMATION

| | |
|---|---|
| **Name of Company:** | Sedicii Innovations Limited |
| **Place of incorporation:** | Ireland |
| **Registered number:** | |
| **Registered office:** | ArcLabs Research & Innovation Centre, WIT West Campus, Carriganore, Co. Waterford |
| **Date of incorporation:** | 19 December 2013 |
| **Company Type:** | Private Company Limited by Shares - LTD |
| **Directors:** | Robert Leslie<br>Patrick Curry<br>Christina Kaufmann |
| **Secretary:** | Peter Barry |
| **Financial Year End:** | 31 December |
| **Issued Share Capital** | €339.3671 divided into 3,275,951 Ordinary Shares and 117,720 Preferred Ordinary Shares each held as set out in Schedule 1. |

**SCHEDULE 3** – **SHAREHOLDER MAJORITY RESERVED MATTERS**

1. **Amendments**

   The amendment of any provision of the Constitution that would materially adversely impact the rights of the Integra Investors, NYC Investors, In-Q-Tel, Sean Van Den Haute, Twilightford UC or Enterprise Ireland.

2. **Share reorganisations**

   Other than pursuant to this Agreement and the EI Put Options, the increase, reduction, repayment, redemption, purchase (or repurchase), sub-division, consolidation or other variation of the share capital of the Company including mergers and demergers, or the reduction of the amount (if any) standing to the credit of any non-distributable reserve (including the share premium account or capital redemption reserve fund) of the Company.

3. **Winding-up, etc.**

   The passing of any resolution to wind up the Company or the filing of any petition for the appointment of an administrator or liquidator, or the making of an invitation to any person to appoint an administrative receiver or the entry by the Company into any scheme or arrangement with its creditors.

4. **Substantial acquisitions or disposals of assets**

   Any acquisition or disposal (including any purchase, sale, transfer, lease, licence or hire purchase) by the Company of any asset or group of assets, other than to the extent that such acquisition or disposal is:

   (a)   specifically forecast or provided for in the Budget for the financial year in which it occurs; or

   (b)   in the ordinary course of trading.

## SCHEDULE 4 – Z2B MINORITY RESERVED MATTERS

1.   **Security Issues to Z2B Competitors**

    1.1    Other than pursuant to this Agreement and subject to paragraph 1.2 below, the creation, allotment or issue of any Securities by the Company, or the grant of any right to require the allotment or issue of any such Securities by the Company (other than the creation, allotment or issue of any Securities in accordance with the terms of this Agreement) to any Z2B Competitor (or any affiliate thereof).

    1.2    In the event that:

    1.2.1    the Board determines in good faith and acting reasonably that it is in the best interest of the Company to conduct an issuance of share capital which would otherwise require the consent of Z2B pursuant to paragraph 1.1 above on an accelerated basis (for example (but, for the avoidance of doubt, not limited to) if and to the extent such issuance is necessary in order to prevent (i) an Insolvency Event or (ii) a breach of a covenant relating to any borrowings of the Company (which breach has not been waived or otherwise permitted by the relevant lender) or (iii) otherwise to prevent significant damage to the Company's ability to operate profitably; or

    1.2.2    the only party willing to subscribe for Securities in the Company is a Z2B Competitor;

    then such issuance may (subject to all approvals pursuant to this Agreement having been obtained and other requirements of such issuance having been satisfied, if applicable) be completed without Z2B's prior consent.

2.   **Product Launches in Spain**

The launch of any of the Company's products or services in Spain or the entering into by the Company of any kind of exclusivity arrangement with a Z2B Competitor (or any affiliate thereof) in Spain during the period commencing on the Effective Date and ending six (6) months following the Effective Date.

### SCHEDULE 5 – ENTERPRISE IRELAND RESERVED MATTERS

1.    For the purposes of this Schedule, the following terms having the following meanings (unless the context otherwise requires):

1.1    **"Audited Accounts",** the audited balance sheet and profit and loss account of the Company (or, if appropriate, the consolidated balance sheet and profit and loss account of the Company) including the directors' and auditor's reports thereon any notes thereto together with all documents required by law to be attached thereto;

1.2    **"Eligible Activity",** the production of products or the provision of a service specified in the Schedule to the Industrial Development (Service Industries) Order 2010;

1.3    **"Encumbrance",** any type of encumbrance or security interest of any nature and shall include, without limitation, the following:

     (a)    any mortgage, charge, assignment, hypothecation, pledge, lien or security interest, agreement or arrangement of any nature whatsoever having a similar effect;
     (b)    any option or right of pre-emption or first refusal or right to acquire or other type of preferential  right (including reservation of title);
     (c)    any guarantee, indemnity or security in respect of the obligations of any other person;
     (d)    any rights pursuant to a hire purchase, lease or instalment purchase agreement; and
     (e)    any adverse claim or right or third party right;

1.4    **"ICO",** any initial coin, token or cryptocurrency offering or any other similar digital offering involving blockchain and/or decentralised distributed ledgers.

1.5    **"Intellectual Property",** any and all rights in any part of the world pertaining to discoveries, trade secrets, confidential business information, financial, marketing or business data, concepts, ideas and improvements to existing technology (whether or not written down or otherwise converted to tangible form), trade names, trade marks, logos, service marks, patents, patent applications, patent disclosures, designs, algorithms, database rights, goodwill, copyright(s), moral rights, know-how, reputation, get-up, computer programs and analogous property, plans, models, and all other rights in any domain names, literary, dramatic, musical and artistic works and all other forms of industrial or intellectual property (whether or not registered or registerable and to the fullest extent thereof and for the full period thereof and all extensions and renewals thereof) including any domain names, pricing and cost information, business and marketing plans and customer and supplier lists and information together with the benefit of all applications for registration thereof and all rights and interest, present and future, thereto and therein;

1.6    **"Listing",** the admission of any Shares to trading on the official list or other market of the Irish Stock Exchange plc or the London Stock Exchange plc or on any other recognised stock exchange;

1.7    **"Management Accounts",** the unaudited quarterly management profit and loss accounts and balance sheet of the Company in a format acceptable to Enterprise Ireland; and

1.8    **"Unapproved Activity"**, and of the following:

     (a)    Supplying goods or services of a pornographic nature, or which form part of the adult entertainment industry;
     (b)    supplying a service which includes "a lottery" or "Gaming", as those terms are defined in the Gaming and Lotteries Act, 1956; or
     (c)    supplying goods or services of a primarily military relevance;

2.    **Unapproved Activity**

     The Company shall not carry on an Unapproved Activity.

7893303.11

3.    **Information**

3.1.1    The Company shall keep Enterprise Ireland informed of the progress of the business of the Company and shall furnish Enterprise Ireland (whenever so required) with such reasonable particulars of any matters relating to the activities of the Company and without prejudice to the generality of the foregoing shall submit to Enterprise Ireland's ICT Division:-

(a)    Management Accounts within three months from the end of each financial quarter of the Company; and

(b)    Audited Accounts within six months from the end of each financial year of the Company; and

3.1.2    The Company shall furnish to Enterprise Ireland (whenever required by Enterprise Ireland) information on its sales, exports, employment, and prospects for the purpose of surveys which Enterprise Ireland may conduct or participate in from time to time.

4.    **Power of Attorney**

Enterprise Ireland shall not be required to grant a power of attorney in respect of any matter relating to its shareholding in the Company and no such power shall be provided for in the constitution of the Company.

5.    **Costs**

In the event of any action by the Company, including further investment in the Company, future financing, any realisation or restructure of the Group, which as a result of such action requires Enterprise Ireland (as a shareholder of the Company) to seek professional advice in relation to a jurisdiction outside of Ireland, the Company shall (subject to compliance with applicable laws) bear and discharge on demand the professional costs and expenses of Enterprise Ireland (including reasonable legal and properly vouched costs and expenses) in connection therewith, whether or not such matter is successfully completed.

6.    **Restriction on Transfer by Promoter**

Robert Leslie hereby agrees that he shall not, without the prior written consent of Enterprise Ireland (which consent shall not be unreasonably withheld), sell, assign, transfer or otherwise dispose of or grant an Encumbrance over any of his Shares or any portion thereof or any right or interest therein now held or hereafter acquired.

7.    **Restricted Transactions**

For so long as Enterprise Ireland holds Shares, the Company shall not without the prior written consent of Enterprise Ireland:

7.1.1    cease to carry on an Eligible Activity;

7.1.2    create or issue or agree to create or issue any share or convertible debt or give or agree to give any option in respect of any share or convertible debt;

7.1.3    redeem or buy back any Shares or give, whether directly or indirectly, any financial assistance for the purpose of or in connection with a purchase of any Shares;

7.1.4    consolidate sub-divide or alter any of the rights attaching to any Shares or reduce its share capital or repay any amount standing to the credit of any share premium account or capital redemption reserve fund or capitalise any reserves or otherwise reorganise its share capital in any way or create any new class of shares;

7.1.5     alter the provisions of the constitution of the Company in any way;

7.1.6     create, agree to create or allow to subsist any Encumbrance on or over the whole or any part of its present or future undertaking or assets (including, without limitation, any of the Group's Intellectual Property) except in the ordinary course of business and for the benefit of the Group;

7.1.7     apply for or obtain a Listing of the Company;

7.1.8     dispose of any shares or otherwise reduce the percentage shareholding held by it in any company nor whether by one transaction or by a number of transactions (whether related or not and whether at one time or over a period of time) sell, transfer, lease, licence or otherwise dispose of the whole or any substantial or material part of its assets (including fixed assets, freehold or leasehold property) or undertaking or any interest therein or enter into a contract to do so;

7.1.9     enter into any partnership or joint venture with any other person except in the ordinary course of business and for the benefit of the Company, or consolidate, amalgamate or merge with any other company or concern.

7.1.10    apply for, obtain, participate in or undergo an ICO.

8.     **Initial Coin Offering (ICO)**

Without prejudice to paragraph 7.1.10, if the Company applies for an ICO then the Company (or any Shareholder as the case may be) must notify Enterprise Ireland and provide Enterprise Ireland with such information as Enterprise Ireland may require in relation to such ICO.

**SCHEDULE 6** – DEED OF ADHERENCE

**THIS DEED OF ADHERENCE** is made on [ • ]

**BY**:

*[NAME OF NEW SHAREHOLDER]* of *[insert address of New Shareholder]* (the **New Shareholder**) in favour of the persons whose names are set out in the Schedule to this Deed and is supplemental to the Shareholders Agreement dated [ • ] 2021 between (1) the parties whose names and addresses are set out in Schedule 1 therein and (2) Sedicii Innovations Limited (the **Agreement**).

**THE NEW SHAREHOLDER UNDERTAKES AS FOLLOWS**:

The New Shareholder confirms that [it/he/she] has read a copy of the Agreement and covenants with each person named in the Schedule to this Deed to perform and be bound by all the terms of the Agreement as if the New Shareholder were named in the Agreement as a Shareholder.

This Deed (and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this deed or its formation) shall be governed by and construed in accordance with Irish law.

**IN WITNESS** whereof this Deed has been executed by the New Shareholder and is intended to be and is hereby delivered on the date first above written.

[Schedule to Deed to include all parties (including by way of earlier Deeds of Adherence) to the Agreement]

[Appropriate execution block to be inserted for New Shareholder, executing a document as a deed]


_____

Signature of Witness

_____

Name of Witness

_____

Occupation of Witness

_____

Address of Witness


or


Given under the common seal of
[**Insert name of new shareholder**]
and delivered as a deed:

**SCHEDULE 7 – CONSTITUTION**

Signed and delivered as a deed by
**ROBERT LESLIE**
in the presence of:

_____
Witness signature

Daniela
_____
Witness name (in print)

Rockshire Road, Waterford
_____
Address

_____
Occupation

_____
ROBERT LESLIE

Signed and delivered as a deed by
**ROBERT LESLIE** in his capacity as
trustee of the **SEDICII EMPLOYEE
SHARE PARTICIPATION PROGRAM**
in the presence of:

_____
Witness signature

Daniela
_____
Witness name (in print)

Rockshire Road, Waterford
_____
Address

_____
Occupation

_____
ROBERT LESLIE

Given under the Common Seal of
**SEDICII INNOVATIONS LIMITED**
in the presence of:

_____
Director

_____
Director / Secretary

7893303.11

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

LYNN
Witness name (in print)

HP19 9SG
Address

COMPANY DIRECTOR
Occupation

Signed and delivered as a
deed for and on behalf of

By:

Signature of
Authorised
Representative:  _____

Printed Name:  _____

Position:  _____

* Signed and delivered as a deed by

in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

7893303.11

33

Signed and delivered as a deed by
▓▓▓▓▓▓▓▓▓
in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

Signed and delivered as a          Signature        of
deed for and on behalf of          Authorised
                                   Representative:
▓▓▓▓▓▓▓▓▓▓▓
                                   Printed Name:   ▓▓▓▓▓▓▓
By:
                                   Position:       *DIRECTOR   TTO*

Signed and delivered as a deed by
▓▓▓
in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

7893303.11

33

Signed and delivered as a deed by

~~STUART MILLSON~~

in the presence of:

_____

Witness signature

_____

Witness name (in print)

_____

Address

_____

Occupation

Signed and delivered as a deed for and on behalf of **NATIONAL UNIVERSITY OF IRELAND, GALWAY** By:

Signature of Authorised Representative:  _____

Printed Name:  _____

Position:  _____

Signed and delivered as a deed by **MARTIN HAEMMIG**

_____

Witness signature

Julia

_____

Witness name (in print)

5400 Baden, Switzerland

_____

Address

IT-Project Manager

_____

Occupation

Executed as a deed and delivered
for and on behalf of

in t

Signed and delivered as a deed by

in the presence of:

_____

Witness signature

_____

Witness name (in print)

_____

Address

_____

Occupation

Signed and delivered as a deed by

in the presence of:

_____

Witness signature

_____

Witness name (in print)

_____

Address

_____

Occupation

**Authorised Signatory**

7893303.11

34

Executed as a deed and delivered
for and on behalf of

in the presence of:

_____
**Authorised Signatory**

Signed and delivered as a deed by

in the presence of:

Witness signature

EVELINE
Witness name (in print)

5300 Zug, Switzerland

Address

Individual

Occupation

MAURICE PEDERGNANA

31-12-2021

Signed and delivered as a deed by

in the presence of:

_____

Witness signature

_____

Witness name (in print)

_____

Address

_____

Occupation

Executed as a deed and delivered
for and on behalf of

in the presence of:

_____
**Authorised Signatory**

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

Daniela
_____
Witness name (in print)

Rockshire Road, Waterford
_____
Address

Chef
_____
Occupation

7893303.11

34

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

ANNA
_____
Witness name (in print)

_____
Address

PROFESSIONAL MOM
_____
Occupation

**DANIEL BERTHOLET**

31 /12/2021

- BOUGERIES
GENEVA   SWITZERLAND

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

Signed and delivered as a deed by

in the presence of:

_____
Witness signature

_____
Witness name (in print)

_____
Address

_____
Occupation

7893303.11

35

**Signed by:**
**Print name:**
**Date:**

**Signed by:**
**Print name:**
**Date:**                    31.12.2021

**Signed by:**
**Print name:**
**On behalf of:**
**Date:**

**Signed by:**
**Print name:**
**On behalf of:**
**Date:**

Signed and delivered as a deed by

In the presence of:

_____

**Witness signature**

_____

**Witness name (in print)**

_____

**Address**

_____

**Occupation**

Signed and delivered as a deed by

in the presence of:

_____

**Witness signature**

_____

**Witness name (in print)**

_____

**Address**

_____

**Occupation**

Signed and delivered as a deed by                    31. 12. 2021

in the presence of:

_____

**Witness signature**

Marto                    ROBERT

**Witness name (in print)**

_____

**Address**

_____

**Occupation**

789309.11

35

Scanned with CamScanner

Executed and delivered as a deed by



acting by                              director

in the presence of:

Signature of Witness
Name of Witness
Address of Witness

Occupation of Witness                    HEAD OF COMMUNICATIONS